# THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# BRYSON CITY DIVISION
# CRIMINAL CASE NO. 2:13-cr-00006-MR

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **O R D E R** |
| ) | |
| NINIAN ULYSSES BOND II, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**THIS MATTER** is before the Court for the determination of certain issues related to the Defendant's sentencing, including the Government's request for the entry of a forfeiture money judgment. [Doc. 18].

**I.  PROCEDURAL BACKGROUND**

On April 18, 2013, Defendant was charged in a Bill of Indictment [Doc. 1] with mail and wire fraud related to his scheme to retransmit DIRECTV satellite television signals to customers of a cable television company operated by him. The Indictment contained a finding by the Grand Jury that there was probable cause for a "forfeiture money judgment in the amount of at least $6,028,000, such amount constituting the proceeds of the violations set forth in [the] bill of indictment . . . ." [Doc. 1 at 6]. On July 31, 2013, the

Defendant pled guilty without a plea agreement to Count One and Count Two of the Indictment. [Doc. 12].

A draft Presentence Report (PSR) was prepared and filed on May 22, 2014. [Doc. 14]. The Defendant submitted objections to the PSR, primarily regarding the loss amount used in the calculation of the Defendant's offense level. [Doc. 15]. A final PSR was prepared and filed on June 23, 2014 [Doc. 16], and the Defendant was scheduled for sentencing on October 9, 2014.

On August 28, 2014, the Government filed a motion for the entry of a forfeiture money judgment in the amount of $531,676.94 against the Defendant. [Doc. 18]. Thereafter, the Defendant moved to continue the sentencing hearing [Doc. 19], which the Court granted [Doc. 20]. The sentencing hearing was rescheduled for December 16, 2014.

On December 12, 2014, four days prior to sentencing, the Defendant submitted an addendum to his PSR objections, including an economist's report analyzing the question of the loss amount. [Doc. 21]. That same day, the Government submitted a Supplemental Memorandum in support of its motion for a forfeiture money judgment, reducing the amount of the requested judgment from $531,167.66 to $438,059.44 in order to give the Defendant credit for expenses paid to DIRECTV and 4COM, a DIRECTV

dealer. [Doc. 22]. The parties also filed sentencing memoranda prior to the hearing. [Docs. 23, 24].

The Court proceeded with the sentencing hearing on December 16, 2014, and both sides presented evidence concerning loss amount, restitution, and forfeiture. The hearing was not concluded, however, and the parties were given the opportunity to submit additional briefs to the Court regarding the calculations attendant to these three issues. The parties filed their supplemental briefs on January 2, 2015. [Docs. 25, 26, 27]. In its supplemental briefing, the Government contends that the applicable estimate loss for sentencing purposes is not less than $385,676.94, and not more than $4,563,601.56. [Doc. 26 at 1].[1] The Government further revised its forfeiture calculation, reducing its request for a forfeiture money judgment to $385,676.94. [Id. at 8].

On April 12, 2015, the Defendant a Supplement to Memorandum Regarding Loss Amount Calculations [Doc. 28], which was supported by an Affidavit of the Defendant [Doc. 29].

---

[1] While the Government does not specifically address restitution in its sentencing memoranda, the PSR recommends the imposition of a restitution judgment in the amount of $4,563,601.56 for the benefit of DIRECTV. [Doc. 16 at 20 ¶100].

The Defendant's sentencing is set to be concluded on April 16, 2015. The issues regarding restitution, loss amount, and forfeiture, however, have been fully briefed and argued and are therefore now ripe for determination

## II.   FACTUAL BACKGROUND

From in or about July 2002, through on or about December 13, 2011, the Defendant effectuated a scheme to retransmit television programming signals he had purchased from satellite television programming provider DIRECTV to customers of Highlands Cable Group ("HCG"), a cable TV business operated by the Defendant.[2] In order to effectuate this scheme, the Defendant established and used multiple DIRECTV residential subscriber accounts and commercial lodging subscriber accounts ("Satellite Master Antenna Television accounts" or "SMATV accounts") to acquire thirty DIRECTV integrated satellite receivers and access cards necessary to decode DIRECTV's encrypted satellite programming signals. The Defendant then used the equipment to decode 30 channels of DIRECTV

---

[2] It is unclear whether HCG is a limited partnership or a limited liability company. The Indictment alleges that the Defendant was the owner and principal operator of HCG, and that he also "was an owner, registered agent and manager of a limited partnership and limited liability corporation [sic] in connection with [HCG]." [Doc. 1 at 1]. There was evidence presented at the December 16, 2014, sentencing hearing indicating that the company is a limited partnership, with 31 limited partners owning a 50% share of the company. Regardless of the company's corporate structure, it is apparently not in dispute that the Defendant was a principal owner and operator of the company and was responsible for the majority of its day-to-day operations.

programming and rebroadcast these channels -- along with other legitimately-obtained channels -- to HCG cable subscribers in exchange for a monthly service fee.

Law enforcement ultimately identified a total of 93 functional television receivers at HCG's "head-end" – that is, the master distribution center of the cable TV system where incoming television signals were received from providers and retransmitted to HCG's subscribers. Of those receivers, law enforcement identified that thirty of the receivers (32.26%) were DIRECTV receivers.[3] It is undisputed that the Defendant paid DIRECTV the monthly residential/SMATV subscription fees for the 30 receivers at issue, but that his usage of the receivers in this matter violated the user agreements for these receivers.

With respect to the issue of forfeiture, the Government relies on the profit and loss records seized from HCG, which identified total gross revenue of $1,484,144.94 from 2003 through 2011. In order to establish what amount of these gross receipts was derived from the fraud related to DIRECTV, the

---

[3] Law enforcement initially identified 95 receivers at the head-end, with 34 connected DIRECTV receivers, and the Government based its initial loss amount and forfeiture calculations on these figures. Additional investigation following the December 16, 2014 sentencing hearing led investigators to conclude that there were only 93 functional receivers, 30 of which were DIRECTV receivers.

Government calculated 32.26% of $1,484,144.94, to arrive at $478,785.16 in revenue related to the 30 connected DIRECTV receivers. After deducting $93,108.22 in payments made by HCG to DIRECTV and 4COM, the Government calculates the total net revenue connected to the Defendant's fraud to be $385,676.94. With respect to the issues of loss amount and restitution, the Government contends that the law and evidence support a broad range within which the Court may make its findings, spanning from the Defendant's known revenue gain of $385,676.94 to the lost revenue claimed by DIRECTV of $4,563,601.56.

On April 13, 2015, the Defendant submitted an Affidavit, which for the first time identifies the total number of HCG channels that were broadcast every year during the relevant time period[4] and the percentage of those channels that were obtained from DIRECTV:

| Years | DIRECTV Channels | Total HCG Channels | Percentage |
|---|---|---|---|
| 2003 | 18 | 121 | 14.8% |
| 2004 | 21 | 124 | 16.9% |
| 2005 | 21 | 126 | 16.6% |
| 2006 | 21 | 126 | 16.6% |
| 2007 | 21 | 126 | 16.6% |
| 2008 | 21 | 126 | 16.6% |
| 2009 | 21 | 134 | 15.6% |

---

[4] The Defendant's Affidavit identifies the number of HCG channels broadcast from 2002 through 2011. The Government, however, has provided evidence only of HCG's revenue for the years 2003 through 2011. Accordingly, the Court will limit its analysis to the years 2003 through 2011.

| 2010 | 22 | 146 | 15.0% |
| 2011 | 29 | 156 | 18.5% |

This information reflects that of the total channels broadcast by HCG from 2003 through 2011, an average of 16.36% of those channels were obtained from DIRECTV. Using this average percentage in lieu of the 32.26% figure proposed by the Government results in a calculation of $242,806.11 in revenue related to the DIRECTV receivers. After deducting the $93,108.22 in payments made by HCG to DIRECTV and 4COM, the total net revenue connected to the Defendant's fraud is $149,697.89.

### III.  DISCUSSION

#### A.  Loss Amount

Section 2B1.1(a) of the Guidelines provides a base offense level of 7 for violations of 18 U.S.C. §§ 1341 and 1343, with an enhancement under subsection (b) that is determined by the amount of loss suffered as a result of the fraud. The burden is on the Government to establish the amount of the loss. United States v. Dawkins, 202 F.3d 711, 714 (4th Cir. 2000).

The amount of loss is the greater of the actual loss or the intended loss.[5] U.S.S.G. § 2B1.1, cmt. n.3(A). "Actual loss" is defined as "the

---

[5] There is nothing in the record to indicate that the Defendant intended any loss on the part of DIRECTV.

reasonably foreseeable *pecuniary harm that resulted from* the offense." Id., cmt. n.3(A)(i) (emphasis added). If a loss occurred but the amount of such loss reasonably cannot be determined, the Court *must* use the gain that resulted from the offense as an alternative measure of loss. Id., cmt. n.3(B) (emphasis added). A defendant's "gain" may be measured by gross sales or some other reasonable gauge. See United States v. Marcus, 82 F.3d 606, 608 (4th Cir. 1996). While the Court "need only make a reasonable estimate of the loss," U.S.S.G. § 2B1.1, cmt. n.3(C), "an estimate that is unsupported by any evidence cannot be reasonable." United States v. Catone, 769 F.3d 866, 877 (4th Cir. 2014) (internal citation omitted).

In the present case, DIRECTV claims that the Defendant's retransmission of 30 of its channels resulted in a loss in its revenue of $83.97 for each subscriber of HCG for each month between July 2002 and December 2013, resulting in a total loss of $4,563,601.56. This calculation, however, is flawed in many respects.

First, DIRECTV's claim of loss rests on the faulty assumption that absent the Defendant's fraud, HCG customers would have foregone cable television service and opted instead for DIRECTV's satellite service. As the Defendant correctly points out, however, residential customers typically do not choose to receive both cable and satellite service; doing so is cost-

prohibitive and generally unnecessary, as most if not all programming available through satellite is also available through a cable service. Additionally, there are other reasons why HCG customers were unlikely to have become DIRECTV subscribers. Satellite reception requires an unobstructed view of the Southern sky, which in a mountainous area such as the Highlands area of Macon County may not be feasible. Additionally, much of HCG's cable service went to vacation homes where cable service was needed only for certain months out of the year. HCG provided service on a month-to-month basis, whereas the typical satellite service contract is for one year. Indeed, at sentencing, DIRECTV's chief investigator, who testified on behalf of the Government, was unable to identify even one HCG customer who switched to DIRECTV after the Government shut down HCG's operations on December 13, 2011.

The Court also finds that DIRECTV's claim of a $4,563,601.56 loss is not a reasonable estimate of the pecuniary harm that DIRECTV actually suffered. In claiming this amount, DIRECTV uses the monthly subscription rate for its *entire* satellite package, which includes 225 channels; however, the Defendant retransmitted only 30 DIRECTV channels, or approximately 13% of DIRECTV's satellite package. Additionally, DIRECTV uses its subscription rate as of 2013 and not the rate for each year the "loss"

supposedly occurred. The greatest problem with DIRECTV's calculation, however, is that the Government has not presented any evidence that DIRECTV was even *capable* of providing this service in the areas and to the subscribers at issue due to the terrain. For these reasons, the Court finds that DIRECTV's calculation does not accurately reflect the value of the channels retransmitted by the Defendant to his cable customers.[6]

Based on the evidence presented, the Court concludes that if DIRECTV suffered any loss as a result of the Defendant's conduct, such loss was relatively small; it cost DIRECTV no more to provide the signal to the Defendant, and as explained above, DIRECTV likely would not have sold this signal directly to HCG customers.[7]

---

[6] In arguing that the full retail value of DIRECTV's satellite package should be used in determining the loss amount, the Government references U.S.S.G. § 2B5.3, which provides for the use of the retail price that the user of the satellite cable transmission would have paid to lawfully receive that transmission in determining the loss amount. Notably, however, this case does *not* involve the illegal interception of a satellite cable transmission in violation of 18 U.S.C. § 2511. The Defendant received the signals legitimately and paid for them. It was his re-transmission that was improper. Thus, this Guideline is inapplicable here.

[7] There was some reference at the sentencing hearing to the fact that DIRECTV paid licensing fees to networks and other programmers for the right to broadcast the television channels. It would seem that if anyone was harmed by the Defendant's retransmission of DIRECTV's signals, it would have been these programmers. The Government, however, has not presented any evidence from which the Court reasonably can determine that such a loss *actually* occurred. Based on the record presented, the Court is unable to determine whether these programmers would have been entitled to additional fees or other payments as a result of the Defendant's retransmission of these channels.

Where a loss is found, but the amount of such loss cannot reasonably be determined from the record, the Defendant's gain resulting from the offense must be used as an alternative measure of loss. U.S.S.G. § 2B1.1 cmt. n.3(B) ("The court *shall use the gain* that resulted from the offense as an alternative measure of loss….") (emphasis added). Profit and loss records seized from HCG identified total gross revenue of $1,484,144.94 from 2003 through 2011. The Defendant has presented evidence that an average of 16.36% of the HCG channels during the relevant time period were retransmitted DIRECTV channels. [Doc. 29]. With regard to the calculation of HCG's gain, the Court finds the Defendant's evidence to be much more persuasive than that presented by the Government. The Defendant presented evidence of the number of channels HCG provided to its customers while the Government only presented evidence of the number of satellite receivers it located at HCG's "head end." The Government made no allowance for signals received by any other method or for any receivers capable of processing multiple signals. The Government's evidence corroborates the accuracy of the Defendant's evidence regarding the number of DIRECTV channels HCG retransmitted, in that 29 such channels were provided to HCG customers and 30 HCG receivers were found (presumably one was a back-up). Most importantly, however, the

Government only presented evidence pertaining to December 2011 and then applied that "snapshot" across the ten years of HCG's operation. The Defendant, however, presented the evidence of total channels and DIRECTV channels for each year. The Government's evidence is simply too incomplete to be of much value in this calculation. The methodology of calculation employed by the Government and the Defendant are the same. The Defendant's calculations are simply based on more complete data. Accordingly, the Court finds that 16.36% of HCG's total gross revenue, or $242,806.11, is reasonably related to the Defendant's unlawful use of the DIRECTV receivers. After deducting $93,108.22 in payments made by HCG to DIRECTV and 4COM for use of the receivers, the Court calculates the total net revenue connected to the Defendant's fraud to be $149,697.89.[8]

In the end, it is reasonable to conclude that there was a loss.[9] Pursuant to U.S.S.G. § 2B1.1, application note comment 3(B), the Court will

---

[8] This calculation, of course, is entirely artificial. It assumes that each channel HCG provided generated exactly 16.36% of its revenue. There was no attempt by the Government to quantify how each of the DIRECTV channels augmented HCG's gross revenue, or what revenue HCG could have expected if it had provided only the channels obtained from sources other than DIRECTV. No market analysis of any kind was presented.

[9] The parties have done little, however, to assist the Court in quantifying the actual loss. Apparently the case was not significant enough to the Government to warrant the effort (which in and of itself says a lot). That being said, simply pro rating the gain on a channel-for-channel basis is as reasonable as any method for estimating HCG's gain, especially

use the $149,697.89 figure as the loss amount for the purpose of calculating the offense level. Such an inexact method of calculating loss, however, renders the resulting guidelines calculation to be of little value in making an assessment of an appropriate sentence considering the factors set forth in 18 U.S.C. § 3553(a).

## B. Restitution

In sentencing the Defendant, the Court may also impose an obligation to pay restitution to any victim of the offense. 18 U.S.C. § 3663(a)(1)(A). In determining whether to order restitution, the Court must consider the amount of the loss sustained by the victim. 18 U.S.C. § 3663(b). The only potential recipient of restitution identified by the Government in this case is DIRECTV. For the reasons stated above, the Court concludes that while the evidence is sufficient to establish a reasonable estimate of the Defendant's *gain*, the Government has failed to present evidence from which the Court reasonably can quantify any actual *loss* on the part of DIRECTV. For these reasons, the Court declines to order restitution in this case.

---

in the absence of any market analysis from the Government.

### C. Forfeiture Money Judgment

The Defendant is subject to mandatory forfeiture due to his convictions for mail fraud and wire fraud. 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1). Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853, as incorporated by 18 U.S.C. § 982(b), dictate the procedures applicable to a criminal forfeiture proceeding. While section 853 does not explicitly authorize forfeiture money judgments, federal courts uniformly have found such judgments to be proper in light of the statutory command to disgorge defendants of their ill-gotten gains, and in light of the statutory admonition that § 853 should be construed "liberally to effectuate its remedial purposes." 21 U.S.C. § 853(o); see also United States v. Hampton, 732 F.3d 687, 691-92 (4th Cir. 2013) ("Although the forfeiture statutes . . . do not expressly authorize personal money judgments as a form of forfeiture, nothing suggests that money judgments are forbidden."), cert. denied, 134 S.Ct. 947 (2014); United States v. Vampire Nation, 451 F.3d 189, 201-02 (3d Cir. 2006) ("Given that § 853 does not contain any language limiting the amount of money available in a forfeiture order to the value of the assets a defendant possesses at the time the order is issued, we think it clear that an *in personam* forfeiture judgment may be entered for the full amount of the criminal proceeds."); United States v. Candelaria-Silva, 166

F.3d 19, 42 (1st Cir. 1999) ("A criminal forfeiture order may take several forms, [including] an *in personam* judgment against the defendant for the amount of money the defendant obtained as proceeds of the offense."); United States v. Voigt, 89 F.3d 1050, 1088 (3d Cir. 1996) (holding that government is entitled to personal money judgment equal to the amount involved in the money laundering offense).

Rule 32.2 of the Federal Rules of Criminal Procedure explicitly permits the government to seek a forfeiture money judgment for the proceeds of the offense. See Fed. R. Crim. P. 32.2(b)(2)(A) ("If the court finds that property is subject to forfeiture, it must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the forfeiture of any substitute property if the government has met the statutory criteria.").[10] When a money judgment is sought, the government is not required to trace the proceeds to the identifiable assets of the defendant. In re Rothstein, Rosenfeldt, Adler, P.A., 717 F.3d 1205, 1213 n.19 (11th Cir. 2013) ("Money is a fungible item. It matters not that the government received the identical money which the

---

[10] The Rules Advisory Committee, however, takes no position on the validity of forfeiture money judgments or the correctness of the judicial rulings authorizing such judgments. See Fed. R. Crim. P. 32.2, Advisory Committee Notes, 2000 Adoption.

defendants received as long as the *amount* that was received in violation of the racketeering statute is known.") (quoting United States v. Conner, 752 F.2d 556, 576 (11th Cir. 1985)). As one district court has explained, the term "money judgment" in this context "is simply shorthand for the valuation or quantification of the proceeds of the [crime], which are forfeitable." United States v. McCrea, No. 7:11-cr-00089-001, 2014 WL 123172, at *1 (W.D. Va. Jan. 13, 2014), appeal filed, Jan. 17, 2014.

The amount of a forfeiture money judgment is not dependent on the amount of assets that the defendant has at sentencing. Hampton, 732 F.3d at 692 ("the amount of forfeiture is measured by the amount of the proceeds received by a defendant – not the amount of assets a defendant retains at the time of sentencing"); accord United States v. Hall, 434 F.3d 42, 59 (1st Cir. 2006) ("even if a defendant does not have sufficient funds to cover the forfeiture at the time of the conviction, the government may seize future assets to satisfy the order"). "Imposing a money judgment despite [the defendant's] lack of assets at sentencing negates any benefit he may have received from the money, ensuring that, in the end, he does not profit from his criminal activity." United States v. Casey, 444 F.3d 1071, 1074 (9th Cir. 2006). If a defendant lacks the ability to pay a money judgment, the

Government can pursue substitute assets under § 853(p) to satisfy the award.  See United States v. Baker, 227 F.3d 955, 970 (7th Cir. 2000).

For the reasons stated above, the Court concludes that determining the HCG's gross revenue, allocating such revenue on a per channel basis, and deducting the amount already remitted to DIRECTV is a reasonable manner of determining the amount of the Defendant's ill-gotten gains in this case.  Therefore, based upon the Indictment, the Defendant's plea of guilty to Counts One and Two, the sentencing materials submitted regarding the fraud related to DIRECTV, the Affidavit of SA Avery, and the Affidavit of the Defendant, the Court finds by a preponderance of the evidence that HCG received $149,697.89 in proceeds as a result of the Defendant's fraudulent scheme.  The Court therefore concludes that the issuance of a money judgment against the Defendant in the amount of $149,697.89 is appropriate in this case.

## O R D E R

**IT IS, THEREFORE, ORDERED** that the Government's Motion for Money Judgment [Doc. 18] is **GRANTED**, and this Order shall constitute the entry of a $149,697.89 forfeiture money judgment against the Defendant Ninian Ulysses Bond, II.  The issues of loss amount and restitution

addressed in this Memorandum of Decision and Order shall be further addressed in the Criminal Judgment to be entered in this case.

**IT IS SO ORDERED.**

Martin Reidinger
United States District Judge